UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

BRANDON HILL, on behalf of himself and
all others similarly situated

      Plaintiff,

v.

SPIRIT AIRLINES INC.,

      Defendant.

_____/

CASE NO. 20-cv-60746

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff, Brandon Hill ("Hill" or "Plaintiff"), on behalf of himself and all others similarly situated by and through undersigned counsel, files this Class Action Complaint against Spirit Airlines Inc., ("Spirit" or "Defendant"), and alleges the following:

### INTRODUCTION

1. Spirit is the seventh-largest air carrier in the United States, providing passenger air travel services within the United States and to select destinations outside the United States in the Caribbean and Latin America.

2. For the last decade, Spirit has operated as an ultra-low-cost carrier, meaning that it offers low base fares by including minimal inclusions in the fare and a greater number of add-on fees.

3. Spirit's provision of low-cost air service has been riddled with criticism and controversy. Indeed, Spirit has been recognized as the airline with the highest rate of consumer complaints to the United States Department of Transportation ("DOT"). In 2015, for example, the passenger complaint rate for Spirit Airlines was nearly ten times higher than the airline industry's overall complaint rate.

1

## The Novel Coronavirus Severely Impacts Spirit's Operations

4. On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness. Days later, researchers in China identified a new virus that had infected dozens of people in Asia, subsequently identified and referred to as the novel coronavirus, or SARS-CoV-2. The illness caused by the virus has been termed COVID-19. By January 21, 2020, officials in the United States were confirming the first known domestic cases of COVID-19.

5. Due to an influx of thousands of new cases in China, on January 30, 2020, the World Health Organization officially declared COVID-19 as a "public health emergency of international concern."

6. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

7. In efforts to curb the spread of the virus, federal, state and local governments have implemented temporary travel restrictions and guidelines advising against essential travel. In the United States, the federal government has limited travel from China, Europe, and the United Kingdom, permitting only the return of U.S. citizens and permanent residents. The Department of State also advised on March 31, 2020, that U.S. citizens should temporarily avoid all international travel, with the exception that U.S. residents abroad should arrange for immediate return to the United States where possible.

8. State and local governments have also restricted local travel. On March 16, 2020, seven counties in the San Francisco, California area announced shelter-in-place orders to reduce local traffic to activities necessary to perform "essential" activities. Other states, counties, and municipalities have since implemented similar shelter-in-place orders, and as of the drafting of this

Class Action Complaint, at least 316 million people in at least 42 states, three counties, nine cities, the District of Columbia, and Puerto Rico are living under such orders.

9. As the travel limitations expanded and virus fears mounted, consumer demand for air travel, particularly leisure and non-essential business travel, quickly declined. In response to this declining demand, Spirit has cancelled many flights in the United States to avoid flying planes with too many empty seats to be profitable.

10. The main way that airlines like Spirit determine operational capacity (*i.e.*, how many flights it markets and flies) is by looking at passenger "load factors" on each route. Load factors measure the percentage of seats filled on an aircraft (or set of aircraft) scheduled to depart. Load factors can be determined for an overall schedule (all flights to all destinations), for particular routes (all flights between two airports), or for particular flight service (a specific scheduled flight with its own flight number). If load factors fall too low, airlines will determine that operating flight service as scheduled would not be profitable (or otherwise economically desirable) and will then typically modify the schedule—including by cancelling previously scheduled flights.

11. Spirit's overall load factor is typically around 84%. But with declining customer demand in light of COVID-19, the airline has seen significant drops in its load factors.

12. Driven by the drop in travel demand, Sprit began cutting flights and will cut its April capacity by 20% and its May capacity by 25%.

**Spirit Offers Credit Rather than Refunds**

13. Despite cancelling a significant portion of its flights, Spirit is only crediting passengers for their cancelled flights and requiring passengers to wait on hold for potentially hours in an attempt to obtain a refund, despite Spirit's obligation to refund fares for cancelled flights.

14. However, as will be explained below, Spirit's Contract of Carriage ("Contract of

Carriage") mandates refunds, not credits in this situation.

15. As numerous customers complained about this practice by Spirit and other airlines, the DOT issued an Enforcement Notice Regarding Refunds by Carriers Given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel ("DOT Notice"). The DOT Notice provides that the airlines must refund tickets if they cancel flights due to the novel coronavirus:

> The U.S. Department of Transportation's Office of Aviation Enforcement and Proceedings (Aviation Enforcement Office), a unit within the Office of the General Counsel, is issuing this notice to remind the traveling public, and U.S. and foreign carriers, operating at least one aircraft having a seating capacity of 30 or more seats, that passengers should be ***refunded promptly*** when their scheduled flights are cancelled or significantly delayed. Airlines have long provided such refunds, including during periods when air travel has been disrupted on a large scale, such as the aftermath of the September 11, 2001 attacks, Hurricane Katrina, and presidentially declared natural disasters. Although the COVID-19 public health emergency has had an unprecedented impact on air travel, ***the airlines' obligation to refund passengers for cancelled or significantly delayed flights remains unchanged.***
>
> The Department is receiving an increasing number of complaints and inquiries from ticketed passengers, including many with non-refundable tickets, who describe having been denied refunds for flights that were cancelled or significantly delayed. In many of these cases, the passengers stated that the carrier informed them that they would receive vouchers or credits for future travel. But many airlines are dramatically reducing their travel schedules in the wake of the COVID-19 public health emergency. As a result, passengers are left with cancelled or significantly delayed flights and vouchers and credits for future travel that are not readily usable. ***Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions). The focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger.*** Accordingly, the Department continues to view any contract of carriage provision or airline policy that purports to deny refunds to passengers when the carrier cancels a flight, makes a significant schedule change, or significantly delays a flight to be a violation of the carriers'

obligation that could subject the carrier to an enforcement action.[1]

(emphasis added).

16. Thus, Spirit's policy violates not only its own Contract of Carriage, but also federal law.

## PARTIES, JURISDICTION AND VENUE

17. Brandon Hill is a Florida citizen who resides in Fort Lauderdale, Florida.

18. Defendant is a Delaware for-profit corporation having its principal place of business in Miramar, Florida.

19. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant.

20. Venue is proper in this Court pursuant to 28 U.S.C. §1391, because this is the judicial district in which a substantial part of the events giving rise to the claims asserted herein occurred and because Defendant's principal place of business is within this district.

## GENERAL ALLEGATIONS

21. On or about January 20, 2020, Plaintiff purchased a ticket for domestic travel from Las Vegas, Nevada to Fort Lauderdale, Florida for travel on March 20, 2020.

22. Plaintiff purchased the tickets directly from Defendant through the Spirit.com website, paying a total of $192.

---

[1] U.S. Dep't of Transportation, Enforcement Notice Regarding Refunds by Carriers given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel (Apr. 3, 2020), https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf.

5

23. Before Plaintiff's travel date, Defendant sent an email to Plaintiff informing him that his flight had been cancelled and could not be rebooked due to schedule changes the airline imposed in light of COVID-19.

24. Despite the fact that Plaintiff could not take the flight he booked, and Defendant could not offer any comparable accommodations, Plaintiff was not given a refund, but was only offered a credit for use on a future flight.

**The Contract**

25. Every Spirit passenger air travel ticket incorporates by reference (including in some cases by hyperlink) and is governed by Spirit's Contract of Carriage, which includes Spirit's Guest Service Plan. *See* Exhibit A.

26. The Contract of Carriage is currently posted on Spirit's website at https://content.spirit.com/Shared/en-us/Documents/Contract_of_Carriage.pdf.

27. Article 10 of Spirit's Contract of Carriage governs refunds, including "Voluntary" and "Involuntary" refunds. The Contract's Involuntary refund terms apply when "Spirit is unable to provide a previously confirmed seat and is unable to reroute the guest via Spirit." Contract of Carriage Art. 10.2.

28. More specifically, the Contract of Carriage provides that "Guests involved in a Spirit Airlines cancellation or delay in excess of two (2) hours will have three (3) options available to them:  1) re-accommodation, 2) a credit for future travel, or 3) a refund." Contract of Carriage Art. 10.2.3.

29. If no portion of the reservation has been used, "the refund will be equal to the fare paid by the guest." Contract of Carriage 10.2.1. If a portion of the reservation has been used, "the refund will be equal to the amount of the unused portion." Contract of Carriage 10.2.2.

30. These involuntary refund terms include no exceptions or limitations based on the reason for Spirit's cancellation.

31. Rather, by the terms of the Contract of Carriage, when Spirit cancels a flight—regardless of reason—passengers who had tickets on the cancelled flight have the option of receiving re-accommodation, a credit for future travel, or a refund.

32. In addition, Spirit's Guest Service Plan, which is incorporated as Article 15 of Spirit's Contract of Carriage, provides that Spirit will "Provide prompt reservation refunds." Specifically, "[f]or guests due a refund, who purchased their reservations (including any charges associated with the fare) with a credit card, Spirit will process the credit within seven (7) business days." Contract of Carriage Art. 15.5.

33. Upon information and belief, the terms of the Refund and Guest Service Plan Articles of Spirit's Contract of Carriage have been substantively identical from at least May 2016 and through April 2020.

34. Here, Plaintiff was not given the choice of being transported on the next available flight at no additional charge. His flight was cancelled and there were no alternative flights. Thus, pursuant to the terms of the Contract of Carriage, Plaintiff is entitled to a refund in U.S. Dollars to his original form of payment.

## CLASS ACTION ALLEGATIONS

35. Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiff seeks certification of the following nationwide class (the "Class"):

> All persons in the United States who purchased tickets for travel on a Spirit Airlines flight scheduled to operate from March 1, 2020 through the date of a class certification order, whose flight(s) were cancelled by Spirit, and who were not provided a refund.

36. Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors,

subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered.

37. Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

38. The Class meets the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

39. **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed class members include thousands of persons across all 50 states, there is significant risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendant. For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing the Defendant to have to choose the court order with which it will comply.

40. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiff at this time, it is believed that the Class is comprised of tens of thousands if not hundreds of thousands of members geographically dispersed throughout the United States. Affected consumer's names and addresses are available from Spirit's records, and class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

41. **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

    a.    Whether Defendant's conduct breaches its Contract of Carriage;

b. Whether Defendant is required to give a refund, rather than credit on a future flight when it cancels a flight and cannot reaccommodate the passengers within a reasonable time of the original flight schedule;

c. Whether Plaintiff and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant;

d. Whether Plaintiff and members of the Class are entitled to compensatory damages;

42. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiff and other Class members (i.e., cancelling flights without giving refunds in breach of the Contract of Carriage) is the same for all Class members.

43. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

44. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments

and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

45.     **Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to offer credits instead of refunds to Plaintiff and Class members for flights that they cancel, thus making declaratory relief a live issue and appropriate to the Class as a whole.

## COUNT I - BREACH OF CONTRACT

46.     Plaintiff realleges and reincorporates its allegations in paragraphs 1 through 46 above as if fully set forth herein.

47.     This claim for breach of contract damages or, in the alternative, specific performance of the contract's refund terms, is based on Defendant's breaches of its Contract of Carriage, including its Guest Service Plan (the "Contract").

48.     Plaintiff, along with all putative class members, entered into a Contract with Defendant for provision of air travel in exchange for payment. This Contract was drafted by Defendant.

49.     Plaintiff, and all putative class members performed under the Contract, specifically, by tendering payment for the airline tickets to Defendant and complied with all conditions precedent under the Contract.

50.     Due to Defendant's cancellation of their flights, Plaintiff, and all putative class members cannot use their airline tickets through no fault of their own and they are not getting the benefit of their bargain with Defendant.

51.     Under the terms of the Contract of Carriage drafted by Defendant, Plaintiff and

putative class members are entitled to refunds because Spirit cancelled their flights and did not rebook the customers on another flight. Contract of Carriage Art. 10. By failing to provide refunds, Spirit has breached its Contract of Carriage.

52. Spirit has further breached its Contract of Carriage by failing to provide refunds within seven days for cancelled tickets purchased with credit cards. Contract of Carriage Art. 15.5.

53. As a result of Defendant's breaches of contract, Plaintiff and the putative class members have incurred damages in an amount to be proven at trial.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all putative Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

1. For an Order determining at the earliest possible time that this matter may proceed as a class action under Rule 23 and certifying this case as such;

2. For himself and each Class member their actual compensatory damages, or in the alternative, for specific performance of the refund provisions of the Contract of Carriage;

3. For reasonable attorneys' fees and costs of suit;

4. For pre-judgment interest; and

5. Such further and other relief the Court deems reasonable and just.

### JURY DEMAND

Plaintiff, on behalf of himself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 10, 2020

Respectfully submitted,

 */s/ Joshua R. Levine*
Jeff Ostrow FBN 121452
Jonathan M. Streisfeld FBN 117447
Joshua R. Levine FBN 91807
**KOPELOWITZ OSTROW**

11

**FERGUSON WEISELBERG GILBERT**
1 West Las Olas Blvd. Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
Email: streisfeld@kolawyers.com
ostrow@kolawyers.com

Hassan A. Zavareei*
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

Daniel L. Warshaw*
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

**pro hac vice* application forthcoming

*Counsel for Plaintiff and the Proposed Class*